COMMONWEALTH vs. LEON BORGES.

Bristol. May 6, 1985. — August 28, 1985.

Present: HENNESSEY, C.J., WILKINS, LIACOS, ABRAMS, NOLAN, LYNCH, & O'CONNOR, JJ.

*Search and Seizure,* Probable cause, Threshold police inquiry. *Constitutional Law,* Search and seizure.

When police officers who had stopped a person suspected of selling heroin ordered him to remove his shoes in order to prevent his flight while they conducted further inquiry, they exceeded the bounds of an investigatory stop, and probable cause for detaining the defendant was required. [790-794] HENNESSEY, C.J., concurring. NOLAN, J., dissenting.

A statement made by an unknown informant to officers in a police cruiser, telling the officers that she had recently been in a bar with a man named Leon, who was selling heroin, and giving a detailed description of the man and his clothing, did not give the officers probable cause to arrest a man matching the informant's description whom they saw in the neighborhood of the bar a short time later. [794-796] HENNESSEY, C.J., concurring. NOLAN, J., dissenting.

Conduct by a defendant in attempting to flee from two police officers who had detained him and in attempting to swallow eight bags of heroin taken from his pocket did not dissipate the taint of the initial illegal detention by police officers without probable cause, and thus suppression of the heroin as the fruit of an illegal arrest was required. [796-797] HENNESSEY, C.J., concurring. NOLAN, J., dissenting.

INDICTMENT found and returned in the Superior Court Department on September 28, 1983.

A motion to suppress evidence was heard by *George Jacobs, J.*

The case was reported by *Wilkins, J.,* following his allowance of the defendant's motion for an interlocutory appeal in the Supreme Judicial Court for the county of Suffolk.

*Louis D. Coffin* for the defendant.

*Dana A. Curhan,* Assistant District Attorney (*Phillip L. Weiner,* Assistant District Attorney, with him) for the Commonwealth.

LIACOS, J. A Bristol County grand jury indicted the defendant, Leon Borges, for possession of heroin with intent to distribute. G. L. c. 94C, § 32 (1984 ed.). A judge of the Superior Court denied the defendant's motion to suppress eight bags of heroin, and a single justice of this court granted the defendant's request for leave to take an interlocutory appeal. Mass. R. Crim. P. 15 (b) (2), 378 Mass. 882 (1979).

The facts, as found by the motion judge, are these. At approximately 5:45 P.M. on September 3, 1983, on a main thoroughfare in New Bedford, a pedestrian hailed a police cruiser. The pedestrian told the two police officers in the cruiser that she wanted to speak with them, but not on the main thoroughfare. The officers and the pedestrian met minutes later on a nearby side street. The pedestrian then informed the officers that she recently had been with a person named Leon in a bar on Purchase Street and that Leon had eight bags of heroin for sale at $40 a bag. She stated that the bags of heroin were in Leon's left pants pocket, and she described in detail both Leon and his clothing. The conversation lasted approximately five minutes. The police officers did not know the identity of the pedestrian; neither one had received information from her before.

The officers then radioed a second cruiser and arranged to meet those officers in a nearby parking lot. The second pair of officers were to act as back-up while the first pair went to the area of the bar. The officers then drove toward the bar looking for the defendant. One of the officers had known the defendant for many years and had assumed that the pedestrian had described the defendant when she spoke of "Leon." The officer had seen the defendant in the area approximately five minutes before the conversation with the pedestrian. The defendant and his clothing matched the description given by the pedestrian.

Upon approaching a magazine store located 150 feet from the bar described by the pedestrian, the officers saw the defendant standing with several other people in front of the store. By the time the officers parked the cruiser in front of the store, the defendant had gone inside the store. The officers entered the

store and asked the defendant to accompany them outside. The three exited the store to the sidewalk. One of the officers then asked the defendant to remove his shoes.[1] The officer then noticed a bulge in the defendant's left pants pocket. He touched the bulge and asked the defendant, "What's this?" The defendant tried to flee, but the two officers almost immediately grabbed him. The three struggled. During the struggle the defendant removed several bags containing heroin from his pants pocket and stuffed them into his mouth. By this time the back-up officers had arrived. One of the officers shouted that the defendant was eating something. Another officer then applied a chokehold to the defendant, causing him to spit out eight bags of heroin. The defendant was subdued and handcuffed.

The motion judge ruled that the defendant was illegally seized when the police officers asked him to step out of the store and to remove his shoes. The judge reasoned that, although there may have been reasonable articulable facts to justify a brief detention of the defendant to conduct a threshold inquiry, see *Terry* v. *Ohio,* 392 U.S. 1 (1968); *Commonwealth* v. *Silva,* 366 Mass. 402, 405 (1974), the officers did not have probable cause to seize the defendant. The judge concluded, however, that, despite the fact that an initial, illegal seizure occurred, intervening events, sufficiently detached from the illegal seizure, established probable cause to arrest the defendant, and therefore the seizure of the evidence was proper.

We conclude that, although the officers may have had a reasonable suspicion that the defendant had committed a crime which would warrant an investigatory stop, the initial seizure of the defendant, i.e., the officer's request that the defendant remove his shoes, exceeded the scope of investigatory stops outlined in *Terry, supra,* and its progeny. Moreover, the initial seizure was unsupported by probable cause. Thus, the seizure violated the defendant's rights under art. 14 of the Declaration of Rights of the Massachusetts Constitution. See *Common-*

---

[1] The officer testified that he made the request to prevent the defendant's flight. The officer knew that the defendant was on parole and believed that the defendant might run if confronted by police officers.

*wealth* v. *Bottari, ante* 777 (1985). We disagree with the judge, in that we believe that subsequent events did not establish probable cause to arrest the defendant. Accordingly, the defendant's motion to suppress was denied improperly.

At the outset we note that the officer's request that the defendant remove his shoes clearly constituted a seizure within the meaning of art. 14.[2] An objective standard is used to determine when a seizure has occurred: "a person has been 'seized' . . . if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States* v. *Mendenhall,* 446 U.S. 544, 554 (1980). See *United States* v. *Hensley,* 469 U.S. 221, 226 (1985) ("stopping a car and detaining its occupants constitutes a seizure"); *Immigration & Naturalization Serv.* v. *Delgado,* 466 U.S. 210, 216-217 (1984) (seizure occurs when circumstances of an encounter are so intimidating that a reasonable person would believe that he was not free to leave); *Brown* v. *Texas,* 443 U.S. 47, 50 (1979) (physical detention of defendant to determine identity implicates Fourth Amendment rights); *Terry, supra* at 16 ("It must be recognized that whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person"). Cf. *Commonwealth* v. *Riggins,* 366 Mass. 81, 86-87 (1974).

A recent United States Supreme Court case contemplates an objective standard within an analogous factual pattern. In *Florida* v. *Royer,* 460 U.S. 491 (1983), detectives approached the defendant in an airport terminal, identified themselves as narcotics officers, and asked the defendant to accompany them to a small office. The detectives retained the defendant's airline ticket and identification throughout the encounter and obtained, and had possession of, the defendant's luggage. The Court held that such action was a seizure for purposes of the Fourth

---

[2] We need not decide whether the request by the uniformed officers that the defendant accompany them outside the store, by itself, constituted a seizure. Cf. *Florida* v. *Rodriguez,* 469 U.S. 1, 5 (1984) (plain clothed officer displaying badge and asking defendant if he would step aside and talk with him was a "consensual encounter" implicating no Fourth Amendment interest).

Amendment. *Id.* at 502, 503 n.9. *Royer* cites the reasonable person test of *Mendenhall, supra,* thus reconfirming the application of an objective, rather than a subjective, standard.[3] Just as the retention of the defendant's airline ticket, identifica-

[3] This court also has applied an objective standard in determining when an arrest requiring probable cause has occurred. In *Commonwealth* v. *Meehan,* 377 Mass. 552, 558-559 (1979), cert. dismissed, 445 U.S. 39 (1980), we stated that "regardless of [a] defendant's [subjective] reaction, there [is] no arrest . . . if a reasonable person on the scene would not receive the impression that the defendant was being forcibly detained." And in *Commonwealth* v. *Avery,* 365 Mass. 59, 65 (1974), we applied an objective standard and ruled that the defendant was under arrest when an officer "seized him and restricted his liberty of movement." The difficulty with the approach of these two cases is that the criteria used to define an arrest — forcible detention and restriction of movement — do not serve to distinguish an arrest from an investigatory stop. A complete restriction on liberty of movement occurs in the typical investigatory stop. 3 W. LaFave, Search and Seizure § 9.2, at 29 (1978). See *United States* v. *Bautista,* 684 F.2d 1286, 1289 (9th Cir. 1982), cert. denied, 459 U.S. 1211 (1983). Moreover, *Terry* apparently contemplates some use of force. *United States* v. *Place,* 462 U.S. 696, 702 (1983). See, e.g., *Watkins* v. *State,* 288 Md. 597, 609 (1980). One commentator has noted that a reasonable person standard actually plays an insignificant role in the outcome of most cases and has concluded that an objective standard is more useful in defining a seizure than it is in distinguishing a stop from an arrest. Williamson, The Dimensions of Seizure: The Concepts of "Stop" and "Arrest," 43 Ohio St. L.J. 771, 815 (1982).

   In *Massachusetts Gen. Hosp.* v. *Revere,* 385 Mass. 772, 778 (1982), rev'd on other grounds, 463 U.S. 239 (1983), we had occasion to define an "arrest": "To constitute an arrest, '"[1] there must be an actual or constructive seizure or detention of the person, [2] performed with the intention to effect an arrest and [3] so understood by the person detained.". . . "[T]he test must be not what the defendant . . . thought, but what a reasonable man, innocent of any crime, would have thought had he been in the defendant's shoes."' *Hicks* v. *United States,* 382 F.2d 158, 161 (D.C. Cir. 1967), quoting from *Jenkins* v. *United States,* 161 F.2d 99, 101 (10th Cir. 1947), and *United States* v. *McKethan,* 247 F. Supp. 324, 328 (D.D.C. 1965)." Use of the officer's subjective intention as a criterion has been rejected in cases where the officer's conduct is inconsistent with a mere momentary stopping. 2 W. LaFave, Search and Seizure § 5.1, at 217 (1978 & Supp. 1985). See *Avery, supra.* Some courts believe that an officer's intentions at the time of a stop are irrelevant in determining whether an arrest occurred. See, e.g., *United States* v. *Danielson,* 728 F.2d 1143, 1146 (8th Cir.), cert. denied, 469 U.S. 919 (1984).

   What is significant, however, about *Massachusetts Gen. Hosp., supra,* is that we held that an arrest occurred when the police officers used extreme force to apprehend the defendant. As will be discussed more fully, *infra*

tion, and luggage in *Royer* constituted a seizure, the removal of the defendant's shoes in the instant case does the same. A reasonable person whose shoes have been removed would not feel free to leave. The defendant was seized.

We turn now to the question whether the intrusiveness of the seizure was proportional to the degree of suspicion that prompted the intrusion. See *Commonwealth* v. *Bottari, supra.* *Terry* held that to be valid "[t]he scope of the [seizure] must be 'strictly tied to and justified by' the circumstances which rendered its initiation permissible." *Terry, supra* at 19, quoting *Warden* v. *Hayden,* 387 U.S. 294, 310 (1967).[4] Courts must inquire "whether the officer's action . . . was reasonably related in scope to the circumstances which justified the interference in the first place." *Terry, supra* at 20.

In *Florida* v. *Royer, supra,* the Court also addressed the question of the proper scope of a stop. A majority of the *Royer* Court believed that there was reasonable suspicion for a stop. A plurality, however, ruled that the limits of a *Terry*-type stop had been exceeded. The detectives retained possession of the defendant's ticket and identification, and obtained possession of his luggage. The Court stated: "The scope of the detention must be carefully tailored to its underlying justification. . . . [A]n investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop. Similarly, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *Royer, supra* at 500.[5]

---

at 794, such a use of force was inconsistent in nature and degree with that authorized by an investigatory stop. Our opinion in *Commonwealth* v. *Bottari, supra,* illustrates, also, that, as matter of State law, use of excessive force in detaining a suspect may raise the nature of a seizure from an investigatory stop to the level of an arrest requiring probable cause. See *Commonwealth* v. *Wallace,* 346 Mass. 9, 16 (1963); *Commonwealth* v. *Holmes,* 344 Mass. 524, 526 (1962).

[4] Although *Terry* involved searches, the same analysis is employed in stops of persons. *United States* v. *Berryman,* 717 F.2d 651, 657 (1st Cir. 1983), cert. denied, 465 U.S. 1100 (1984).

[5] In a concurring opinion, Justice Brennan expanded: "the relevance of a least intrusive means requirement within the context of a *Terry* investigative

Thus, *Terry* and *Royer* state a "principle of proportionality." See *United States* v. *$84,000 U.S. Currency,* 717 F.2d 1090, 1104 (7th Cir. 1983), cert. denied sub nom. *Holmes* v. *United States,* 469 U.S. 836 (1984); *United States* v. *Berryman,* 717 F.2d 651, 657 (1st Cir. 1983), cert. denied, 465 U.S. 1100 (1984). The degree of intrusiveness on a citizen's personal security, including considerations of time, space, and force, must be proportional to the degree of suspicion that prompted the intrusion. See *Bottari, supra.*

We believe that the officers exceeded the bounds of an investigatory stop when they requested that the defendant remove his shoes. Unlike *Adams* v. *Williams,* 407 U.S. 143 (1972), this seizure was not a limited intrusion designed to ensure the officers' safety. There was no evidence that the officers feared for their safety in asking the defendant to remove his shoes. While, on the basis of the informant's information, the officer might have been justified in stopping the defendant and inquiring about the bulge in his pants pocket, the officer requested that the defendant remove his shoes before he noticed the bulge. In short, the means used by these officers to conduct their investigatory inquiry raised the seizure to the level of an arrest. Thus, probable cause was required to justify this type of seizure.

We address the question whether there was probable cause to support the seizure. Under *Commonwealth* v. *Upton,* 394 Mass. 363 (1985), for an arrest to comport with art. 14, information known to police officers at the time of the arrest must satisfy the two-pronged test of *Aguilar* v. *Texas,* 378 U.S. 108 (1964), and *Spinelli* v. *United States,* 393 U.S. 410 (1969): first, a "basis of knowledge" of the informant — the particular means by which he came by the information — must be shown; and second, facts establishing either the general "veracity" of the informant or the specific "reliability" of his statement in the particular case must be provided. In the present case, the

stop is not clear to me. As I have discussed, a lawful stop must be so strictly limited that it is difficult to conceive of a less intrusive means that would be effective to accomplish the purpose of the stop." *Royer, supra* at 511 n.* (Brennan, J., concurring).

informant stated that she had recently been with a person named Leon, and that he was selling heroin. The basis of knowledge inquiry has been satisfied, since this information apparently was derived from the informant's personal observations. However, no evidence supports the veracity or reliability prong. The informant was unknown to the officers; she never before had supplied either of them with information. At the time the officer asked the defendant to remove his shoes, only the informant's description of Leon had been corroborated. Cf. *Commonwealth* v. *Boswell*, 374 Mass. 263, 267-268 (1978) (unreliable tip corroborated by matching defendant's appearance with surveillance photograph of robber). There was no probable cause to require that the defendant remove his shoes.

Having concluded that the officers exceeded the limited scope of a proper investigatory inquiry and that they acted without probable cause, we last consider whether the evidence seized must be suppressed as the fruit of an unlawful seizure. See *Commonwealth* v. *Loughlin*, 385 Mass. 60, 63 (1982). We disagree with the judge's ruling that independent and intervening acts supplied the police officers with probable cause to arrest the defendant. Because the initial stop was improper and the subsequent actions occurred as an immediate and direct result of that illegality, the Commonwealth is not entitled to introduce in evidence the fruit of the unlawful act.

A sufficient causal connection to view evidence as the fruit of an illegal act is not established merely because "but for" the illegal police conduct the defendant would not have responded as he did. *Commonwealth* v. *King*, 389 Mass. 233, 245 (1983). *Commonwealth* v. *Saia*, 372 Mass. 53, 58 (1977). Accord *Dunaway* v. *New York*, 442 U.S. 200, 217 (1979). On the other hand, "an act by a defendant, which may in some sense be considered 'voluntary,' [will not] necessarily break the causal chain." *United States* v. *Bailey*, 691 F.2d 1009, 1013 (11th Cir. 1982), cert. denied, 461 U.S. 933 (1983). In determining whether the connection between an illegal arrest and a subsequent arrest or search has become so attenuated as to dissipate the taint of the illegality, we consider the following: (1) the temporal proximity of the arrest to the defendant's re-

sponse; (2) the presence or absence of intervening circumstances; and (3) the purpose and flagrancy of the misconduct in the context of the circumstances of the arrest. See *Brown* v. *Illinois,* 422 U.S. 590, 603-604 (1975).

The defendant attempted to flee moments after the illegal arrest. The struggle and attempted disposal of the evidence quickly followed. Thus, there is a close temporal proximity between the illegal arrest and the defendant's response.[6] Moreover, the nature of the defendant's intervening actions was insufficient to establish probable cause. Generally, flight alone does not establish probable cause for a "second" arrest. See *Commonwealth* v. *Thibeau,* 384 Mass. 762 (1981); *Commonwealth* v. *Crowley,* 13 Mass. App. Ct. 915 (1982); *United States* v. *Morrison,* 546 F.2d 319, 320 (9th Cir. 1976); *United States* v. *Ogilvie,* 527 F.2d 330, 331-332 (9th Cir. 1975). But see *United States* v. *Garcia,* 516 F.2d 318, 319 (9th Cir.), cert. denied sub nom. *Martinez-Lopez* v. *United States,* 423 U.S. 934 (1975). Compare *United States* v. *Nooks,* 446 F.2d 1283, 1287-1288 (5th Cir.), cert. denied sub nom. *Hughes* v. *United States,* 404 U.S. 945 (1971). Nor does the attempted disposal of evidence constitute an independent, intervening act sufficient to justify a subsequent arrest where the disposal is in direct and immediate response to the illegal police action. See *United States* v. *Beck,* 602 F.2d 726, 729-730 (5th Cir. 1979); *Massachusetts* v. *Painten,* 368 F.2d 142, 144 (1st Cir. 1966); *Hobson* v. *United States,* 226 F.2d 890, 894 (8th Cir. 1955). Although, in the present case, the defendant attempted both to flee and to dispose of evidence, we believe that because of the close temporal proximity of these events to each other and to the illegal act of the police officers, they cannot be considered independent and intervening acts sufficient to establish probable cause.

The judge relied on *Commonwealth* v. *King, supra,* in ruling that the defendant's independent and intervening acts gave rise

---

[6] We do not reach the question whether the officer's touching of the defendant's pocket constituted an illegal search. However, if the act were an illegal search, the temporal proximity between that illegal act and the defendant's response would be even closer than the one at issue.

to probable cause for arrest. This case, however, is distinguishable from *King.* In *King, supra* at 245, we ruled that the act of shooting at the police officers by the defendant's companion "broke the chain of causation and dissipated the taint of the prior illegality." We view *King* as holding that the commission of a new, "unrelated" crime after an illegal arrest may provide the basis for a valid arrest. Cf. *United States* v. *Bailey, supra* at 1017 (defendant's forcible resistence to arrest was itself a "new, distinct crime").

There is no indication here that the police officers undertook the arrest with consideration of the defendant's intervening acts; only one crime, possession of heroin, motivated the officers' actions throughout the incident. See *Painten, supra* at 143. Apparently, the police officers did not arrest the defendant for assaulting them. See G. L. c. 265, § 13D (1984 ed.). Thus, the purpose of the misconduct, i.e., to effectuate an arrest for possession of heroin, tainted the subsequent acts.

In sum, while intervening acts occurred, as in *King,* we cannot say that these acts were sufficiently independent, in nature and temporal proximity from the primary illegality to justify the defendant's subsequent arrest by the officers. We reverse the order denying the defendant's motion to suppress.

*So ordered.*

HENNESSEY, C.J. (concurring). As frequently occurs in search and seizure cases, we are dealing here with line-drawing of a difficult nature. Necessarily so, because of the subtle balance that we must preserve between law enforcement and the protection of individual privacy. A majority of the court, not counting my contribution, says the evidence in this case must be excluded. The case is close enough to the line so that I bow to the majority's wisdom, but not without doubt on my part. First, I assume that the court is approaching the issue of the informant's reliability in light of this court's recent emphasis that the dual test of *Aguilar-Spinelli* still has vitality under Massachusetts law. In that light, I am troubled by the court's

failure to confront more fully the principle of *Draper* v. *United States,* 358 U.S. 307, 313 (1959). The reliability of the anonymous informant, under the *Draper* principle, can be found where the informant particularly describes the appearance, conduct, and expected behavior of the suspect, and the description is later corroborated by observations of the police before they detain the suspect. As in *Draper,* the description here was not stale news, but right up to the hour, if not to the minute. A good argument can be made that the details provided by the informant here compare favorably with those in *Draper,* including a description of the precise pocket of the suspect where the police could observe a bulge caused by the presence of the contraband.

I write this brief concurrence with the hope that the court will in the future give continued credibility to the *Draper* principle, because that approach, carefully applied, is both in the public interest, and consistent with the spirit of *Aguilar-Spinelli.* I add only that I do not agree with the dissenting opinion in this case, which relies, in part, on *Terry* v. *Ohio,* 392 U.S. 1 (1968). Clearly the police here (and also in *Commonwealth* v. *Bottari, ante,* which is published simultaneously with this opinion), were detaining the suspect for purposes of making a search for contraband. They were not merely, for their own protection, conducting a pat-down for weapons while they questioned a suspicious person. The requisite for a search and seizure in this Commonwealth is probable cause, and not the "articulable suspicion" of *Terry.*

NOLAN, J. (dissenting). I dissent. If ever a fact pattern came within the boundaries of *Terry* v. *Ohio,* 392 U.S. 1 (1968), it is this case. If ever police officers had the right (if not the obligation) to stop and frisk a person, it was here, armed as they were with specific information as to name, place, and particulars of the location of the drugs ("left pants pocket"). One police officer, the judge found, had known Borges for many years. In *Terry, supra* at 5-6, it should be recalled, the detective was not acquainted with either man suspected of

planning a robbery and the detective had received no information about them. The Court in *Terry* acknowledged the "seizure" of the men whose suspicious conduct the detective had observed and insisted that the test was one of reasonableness. *Terry* v. *Ohio, supra* at 19, 30-31. For some reason which the opinion has failed to disclose, the court today decides that it was unreasonable for the officers to require the defendant to remove his shoes to prevent his escape. Would it have been "more reasonable" to keep a gun pointed at his head to prevent his escape?

This is but another example of the extent to which the exclusionary rule has led to a travesty of good order and common sense.