Cowin, J.
The defendant, Kevin F. Lynch, has been charged in two indictments with murder (G.L.c. 265, §1) and rape (G.L.c. 265, §22) and has filed a motion to suppress all evidence derived from a Randolph police officer’s allegedly unlawful stop and detention of him on December 27, 1995. The defendant maintains that the officer had neither probable cause nor grounds for a threshold inquiry at the time of the unlawful detention. A hearing was held on said motion on March 5, 1997 at which three witnesses testified: Randolph Police officers, David Clark and Detective Arthur Sullivan, and the defendant, Kevin Lynch.
After the hearing and an evaluation of the evidence presented, including the credibility of the witnesses, I make the following findings.
*598 FINDINGS OF FACT
In the fall and early winter of 1995, the towns of Randolph and Canton suffered numerous breakings and enterings in a locale that abutted a wooded area known as the Blue Hills Reservation. All the breaks occurred late at night or early in the morning on streets such as Canton Street and High Street which abutted the Reservation area. There were a dozen or more of these burglaries and attempted burglaries during that time and also some automobile break-ins. A Canton police officer chased an individual who fled from one of the breaks and had seen that person run into the woods. A witness to one of the Randolph break-ins had seen the individual run across High Street and into the wooded area. In the series of break-ins, the items taken were not those usually desired by burglars. Items such as food, a gas grill and parts, a quilt, clothing, lamps and a flashlight had been stolen.
The above factors had led the Randolph Police Department to believe the items had been taken by someone who was living in the woods. The police thus focused on the Blue Hills Reservation in pursuit of the suspect. Indeed, dogs had tracked into the woods at one time in search of the suspect and a State Police helicopter had surveyed the Reservation. Officers had also walked through the Blue Hills Reservation and had checked vacant houses in the area. Clearly, the police were focusing their attention on the Blue Hills area as the locus for the suspect who was involved in these cases.
The individual who had been seen fleeing into the woods after one of these breaks was described by the Canton police officer who had pursued him as a white male, 6 feet tall, fairly well built, approximately 180 pounds and wearing an army camouflage jacket and a cap. This description was published in Canton and Randolph as the one for the “Blue Hills Burglar,” as the suspect became known.[1]
On December 27,1995, Officer David Clark, a Randolph Police officer for ten years, was on High Street at the edge of the Blue Hills Reservation at about noon. He was aware of the above information regarding the Blue Hills Burglar when he saw a person whom he identified as the defendant emerging from the woods on the officer’s right, i.e., coming from a heavily wooded area of thick brush. The officer was not aware whether there was a path in that area because there was deep snow on the ground. The officer saw the defendant walk up High Street toward Soren Street and cross Soren Street.[2]
The officer slowed down and the defendant kept walking up Soren Street. The defendant was 6’2", about 170 pounds and wearing a khaki-type green jacket and baseball cap. The officer then pulled up to the defendant, lowered his driver’s window and said “Hi.” The defendant responded: “Hi." The officer asked Lynch what he was doing in the area. Lynch stated that he was working on some houses in Canton. The officer asked for his name and the defendant responded: “Kevin Lynch.” The officer next asked for the defendant’s date of birth and the defendant responded appropriately. At this time the defendant was standing a couple of feet from the officer. The officer was suspicious of the defendant because the defendant matched the description of the Blue Hills Burglar; he had emerged from the woods which were covered with heavy snow; the defendant was doing work on a house in Canton on Randolph Avenue which was more than two miles from the site where the defendant was presently walking; and the defendant’s route was not “sensible” as he was walking through the woods rather than on the street which had been plowed.
After the defendant gave the officer the above identifying information, the officer called said information into the station. It was approximately one minute between the time that Officer Clark stopped the defendant and the time he made the radio call to the station to check for information received. The officer did not tell the defendant anything concerning whether the defendant should stay at the police car or whether he could leave. After the officer made the radio call, before he received information back from the station, the officer asked the defendant about the house he was working on and the defendant said that they were building a deck on the house. During the entire en-. counter, there had been no display of a weapon by the officer; the officer never touched the defendant; the officer spoke in a normal tone of voice; and the officer did not use any language indicating that compliance would be compelled.
The station then radioed back to Officer Clark that there was a “possible warrant”[3] on the defendant. With this information, Officer Clark asked the defendant if he could check him for weapons. The defendant consented. The officer pat-frisked the defendant. There was no evidence that anything was found. The station then radioed the officer confirming the warrant. The officer asked the defendant if he knew there were a warrant for his arrest and the defendant responded: “Yes.” Officer Clark arrested the defendant and searched him further.
DISCUSSION
Initially, it should be noted that two separate issues are involved here. One is whether there were any seizure by the police in Officer Clark’s initial encounter with the defendant. The second issue is whether, if the encounter were a Terry stop, there are facts that justify such a Terry stop.[4] See Terry v. Ohio, 392 U.S. 1 (1968).
Not every interaction between citizens and police rises to the level of a stop. “Only when the officer by means of physical force or show of authority has in some way restrained the liberty of a citizen, may we conclude that a ‘seizure’ has occurred.” Terry v. Ohio, 392 U.S. 1, 19, n.16 (1968). “Because the average *599 citizen questioned by the police does not necessarily feel free to walk away without responding in some manner, the court looks to the circumstances beyond the show of governmental authority inherent in the mere presence of the police.” Commonwealth v. Pimentel, 27 Mass.App.Ct. 557, 560 (1989). “Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person or the citizen, or the use of language or tone of voice indicating that compliance with the officer’s requests might be compelled. In the absence of some such evidence, otherwise inoffensive contact between a member of the public and the police cannot, as a matter of law, amount to a seizure of that person. Id. Stopping an individual for a brief time to ask a few questions and to conduct a check for warrants does not constitute a seizure under the Fourth Amendment and Article 14. See Commonwealth v. Caro, 419 Mass. 383, 387-88 (1995), and Commonwealth v. Pimentel, supra.
In this case, one police officer in a cruiser approached the defendant and asked him a few questions. There was only one officer present; there was no physical touching involved; no weapon was displayed; and there was no use of language or tone of voice that would indicate that compliance with the police request would be compelled. Considering the totality of the circumstances, there was “nothing in the [officer’s] conduct from which it could be concluded that [he] engaged in a ‘show of authority’... which would cause a reasonable person to feel that he was not free to walk away.” Commonwealth v. Pimentel, supra, at 561 quoting from Commonwealth v. Sanchez, 403 Mass. 640, 643 (1988). There was no stop or seizure of Lynch during this brief encounter.
Even if this encounter were to be considered a stop, the stop would be valid on Terry grounds. Terry v. Ohio, supra, at 16 (1968); Commonwealth v. King, 389 Mass. 233, 241-42 (1983). There was sufficient evidence of specific and articulable facts to justify a reasonable suspicion that the defendant was involved in illegal activity. Commonwealth v. Silva, 366 Mass. 402 (1974). The officer saw a man who fit the description of the Blue Hills Burglar emerging from a heavily wooded area at a time when the woods were covered with deep snow. The man indicated that he was walking to a work site over two miles away and it was not sensible to be walking through the woods in deep snow rather than on the street which was plowed. Thus, these factors created specific, articulable facts to warrant a Terry stop. Once the officer received information that there was a possible “warrant” on the defendant he was justified in pat-frisking the defendant for his safety. Commonwealth v. Moses, 408 Mass. 136(1990) (police may make protective search of suspect in a Terry stop). When the information regarding the warrant was confirmed, the officer then properly arrested the defendant.
ORDER
For the above reasons, the defendant’s motion to suppress is DENIED.

Some Randolph police reports also described the individual in the above manner.

The closest breaking and entering to Soren Street had been on Waldo Street, a street parallel to Soren Street and about 100 yards away from Soren. The Waldo Street break was late in the afternoon or early in the evening. A witness to one of the breakings and enterings had also seen the suspect run across High Street and into the wooded area.

A “possible warrant” means that when the defendant’s name and identifying data were entered into the computer, the screen indicated that there was a warrant outstanding on the defendant. However, the police are required to call the department that holds the warrant to confirm that the department reporting the warrant has the warrant in hand.

In determining that no stop exists here, I do not base my decision on any factors that apply to the Terry issue.